Slip Op. 00 - 120

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - - - -x
SAVE DOMESTIC OIL, INC.,
                                :

                     Plaintiff,
                                :

         v.
                                :

UNITED STATES,                        : Court No. 99-09-00558

                   Defendant, :
           -and-
                                :

API AD HOC FREE TRADE COMMITTEE <u>et alia</u>,                             :

         Intervenor-Defendants.:

- - - - - - - - - - - - - - - - - - - -x

<u>Opinion & Order</u>

[Plaintiff's motion for judgment on the
 agency record granted; remanded to the
 International Trade Administration.]


                             Decided: September 19, 2000


     <u>Wiley, Rein & Fielding</u> (<u>Charles Owen Verrill, Jr</u>. and <u>Timothy C. Brightbill</u>) for the plaintiff.

     <u>David W. Ogden</u>, Assistant Attorney General; <u>David M. Cohen</u>, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (<u>A. David Lafer</u> and <u>Lucius B. Lau</u>); and Office of Chief Counsel for Import Administration, U.S. Department of Commerce (<u>Robert J. Heilferty</u>), of counsel, for the defendant.

     <u>Dewey Ballantine LLP</u> (<u>Harry L. Clark</u>, <u>Michael H. Stein</u>, <u>Bradford L. Ward</u> and <u>John W. Bohn</u>) for intervenor-defendant API Ad Hoc Free Trade Committee.

     <u>White & Case</u> (<u>Carolyn B. Lamm</u>, <u>Adams C. Lee</u> and <u>David L. Elmont</u>) for intervenor-defendant Saudi Arabian Oil Company.

     <u>Shearman & Sterling</u> (<u>Thomas B. Wilner</u>, <u>Jeffrey M. Winton</u> and <u>Jeronimo Gomez del Campo</u>) for intervenor-defendants Petroleos de Venezuela, S.A. and CITGO Petroleum Corporation.

O'Melveny & Myers LLP (Gary N. Horlick and Michael A. Meyer) for intervenor-defendants Petróleos Mexicanos, P.M.I. Comercio Internacional S.A. de C.V., and PEMEX Exploración y Producción.

King & Spalding (Joseph W. Dorn and Duane W. Layton) for intervenor-defendant Texaco Inc.

Barnes, Richardson & Colburn (Robert E. Burke, Brian F. Walsh and Robert F. Seely) for intervenor-defendant BP Amoco.

AQUILINO, Judge:  This case arises from the filing a year ago with the International Trade Administration, U.S. Department of Commerce ("ITA") and the U.S. International Trade Commission ("ITC") of a nine-volume Petition for the Imposition of Antidumping and Countervailing Duties on certain crude petroleum oil products from Iraq, México, Saudi Arabia and Venezuela. The petitioner was stated to be an incorporated consortium of independent domestic crude petroleum oil producers, Save Domestic Oil, Inc. ("SDO"), the individual members of which were named Apache Corporation (Houston, Tex.), Arrow Oil & Gas, Inc. (Norman, Okla.), BOGO Energy Corp. (Oklahoma City, Okla.), Continental Resources, Inc. (Enid, Okla.), Crescent Exploration (Oklahoma City), Farrar Oil Company (Mt. Vernon, Ill.), Houghton Oil & Gas, Inc. (Midland, Tex.), Keener Oil & Gas Company (Tulsa, Okla.), Phoenix Production Co. (Cody, Wyo.), Pickrell Drilling Co., Inc. (Great Bend, Kan.), Royal Drilling & Producing, Inc. (Crossville, Ill.), and Tilley Oil & Gas, Inc. (Enid). The petition requested that the ITA and ITC

> undertake a "regional industry" analysis in determining industry support, market penetration and injury to the domestic crude petroleum oil industry caused by subject

imports[,] . . . defin[ing] th[e] regional market to include, generally, the District of Columbia and the 43 contiguous States (and the U.S. Outer Continental Shelf in the Gulf of Mexico), exclusive of Washington, Oregon, California, Arizona, and Nevada.[1]

Some 40 days later, while finding the petitioner to be an "interested party" within the meaning of 19 U.S.C. §1677(9) and that it had made "an adequate regional-industry claim for initiation purposes", the ITA did not accept the petition on the ground that it "did not have the required industry support".  Dismissal of Antidumping and Countervailing Duty Petitions: Certain Crude Petroleum Oil Products From Iraq, Mexico, Saudi Arabia, and Venezuela, 64 Fed.Reg. 44,480 (Aug. 16, 1999).  Whereupon this case commenced, seeking judicial review and reversal of this determination.

I

Public information of the Department of Commerce[2] shows over one thousand one hundred petitions to have been filed with the ITA since enactment of the Trade Agreements Act of 1979, yet apparently only one was subjected to the kind of threshold agency

_____

[1] ITA Record Document ("R.Doc") 1, vol. I, p. 2.  This region was also described in terms of U.S. "Petroleum Administration for Defense Districts" or "PADD"s I to IV.  See id at 3. See also id. at 4 ("The Region Is A Market Separate From The Rest Of The United States").

[2] U.S. Import Administration, Antidumping Investigations Case Activity (January 1, 1980 - December 31, 1999), at <http://ia.ita.doc.gov/stats/ad8099.htm>; Countervailing Duty Case Activity (January 1, 1980 - December 31, 1999), at <http://ia.-ita.doc.gov/stats/cv8099.htm>.

rejection at issue herein.  See Carbon Steel Plate From Belgium and the Federal Republic of Germany; Rescission of Notice Announcing Initiation of Antidumping Investigations and Dismissal of Petition, 49 Fed.Reg. 3,503 (Jan. 27, 1984) (producers of well over 95 percent of subject merchandise opposed single-producer petition).  In fact, only 17 other petitions are reported as having been summarily dismissed by the ITA over the last 20 years.  Ten of them were found not to allege a basis upon which antidumping or countervailing duties could be imposed.[3]  Another three petitions were dismissed because there had been no or *de minimis* imports of the subject merchandise in the years immedi-

---

[3] See Pure and Alloy Magnesium From Norway: Final Negative Determination; Rescission of Investigation and Partial Dismissal of Petition, 57 Fed.Reg. 30,942 (July 13, 1992); Pure and Alloy Magnesium From Canada: Final Affirmative Determination; Rescission of Investigation and Partial Dismissal of Petition, 57 Fed.-Reg. 30,939 (July 13, 1992); Rescission of Initiation of Countervailing Duty Investigation and Dismissal of Petition: Chrome-Plated Lug Nuts and Wheel Locks From the People's Republic of China ("PRC"); 57 Fed. Reg. 10,459 (March 26, 1992); Dismissal of Countervailing Duty Petition and Termination of Proceeding: Pure and Alloy Magnesium From Norway, 56 Fed.Reg. 49,748 (Oct. 1, 1991); Partial Rescission of Initiation of Antidumping Investigations and Dismissal of Petitions; Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Romania, Singapore, and Thailand, 53 Fed.Reg. 39,327 (Oct. 6, 1988); Potassium Chloride From the Soviet Union; Rescission of Initiation of Countervailing Duty Investigation and Dismissal of Petition, 49 Fed.Reg. 23,428 (June 6, 1984); Potassium Chloride From the German Democratic Republic; Rescission of Initiation of Countervailing Duty Investigation and Dismissal of Petition, 49 Fed.Reg. 23,428 (June 6, 1984); Fresh Cut Roses From Colombia; Dismissal of Antidumping Petition, 46 Fed.Reg. 33,575 (June 30, 1981); Toy Balloons and Playballs From Mexico; Dismissal of Countervailing Duty Petition, 46 Fed.Reg. 31,698 (June 17, 1981); Glass-Lined Steel Storage Tanks, Pressure Vessels and Parts Thereof From France; Dismissal of Countervailing Duty Petition, 45 Fed.Reg. 67,404 (Oct. 10, 1980).

ately preceding their respective filings.[4]  And four were found

not to have been presented by an interested party.[5]

A

Be then all those other, apparently facially-accepta-

ble petitions as they were, from the beginning the Trade Agree-

ments Act has contemplated ITA dismissal of petitions deemed not

in compliance with the threshold standards set by Congress.  As

amended by the Uruguay Round Agreements Act ("URAA"), Pub. L. No.

103-465, 108 Stat. 4809 (Dec. 8, 1994), (and by the Miscellaneous

Trade and Technical Corrections Act of 1996, Pub. L. No. 104-295,

110 Stat. 3514 (Oct. 11, 1996)), the statute governing procedures

for initiating herein an antidumping-duty investigation provided,

in part, as follows:

---

[4] See Initiation of Antidumping Investigation/Dismissal of Antidumping Petitions  Certain Steel Products From Romania, 47 Fed.Reg. 5,752 (Feb. 8, 1982); Initiation of Countervailing Duty Investigations/Dismissal of Countervailing Duty Petition  Certain Steel Products From Luxembourg, 47 Fed.Reg. 5,750 (Feb. 8, 1982); Initiation of Countervailing Duty Investigations/Dismissal of Countervailing Duty Petitions; Certain Steel Products From the Netherlands, 47 Fed.Reg. 5,743 (Feb. 8, 1982).

[5] See Rescission of Initiation of Antidumping Duty Investigation and Dismissal of Petition: Certain Portable Electric Typewriters From Singapore, 56 Fed.Reg. 49,880 (Oct. 2, 1991); High Information Content Flat Panel Displays and Display Glass Therefor From Japan: Final Determination; Rescission of Investigation and Partial Dismissal of Petition, 56 Fed.Reg. 32,376 (July 16, 1991); Hot-Rolled Carbon Steel Sheet From Belgium and the Federal Republic of Germany; Rescission of Notice Announcing Initiation of Antidumping Investigations and Dismissal of Petition, 48 Fed.-Reg. 52,757 (Nov. 22, 1983); Latchet Hook Kits From the United Kingdom; Dismissal of Antidumping Petition, 45 Fed.Reg. 81,241 (Dec. 10, 1980).

## (b) Initiation by petition

### (1) Petition requirements

An antidumping proceeding shall be initiated whenever an interested party described in subparagraph (C),(D),(E),(F), or (G) of section 1677(9) of this title files a petition with the [ITA], on behalf of an industry, which alleges the elements necessary for the imposition of the duty imposed by section 1673 of this title, and which is accompanied by information reasonably available to the petitioner supporting those allegations. The petition may be amended at such time, and upon such conditions, as the [ITA] and the [ITC] may permit.

*    *    *

### (3) Action with respect to petitions

#### (A) Notification of governments

Upon receipt of a petition filed under paragraph (1), the [ITA] shall notify the government of any exporting country named in the petition by delivering a public version of the petition to an appropriate representative of such country.

#### (B) Acceptance of communications

The [ITA] shall not accept any unsolicited oral or written communication from any person other than an interested party described in section 1677(9)(C),(D),(E),(F), or (G) of this title before the [ITA] makes its decision whether to initiate an investigation, except as provided in subsection (c)(4)(D) of this section, and except for inquiries regarding the status of the [ITA]'s consideration of the petition.

*    *    *

**(c) Petition determination**

**(1) In general**

**(A) Time for initial determination**

Except as provided in subparagraph (B), within 20 days after the date on which a petition is filed under subsection (b) of this section, the [ITA] shall --

**(i)** after examining, on the basis of sources readily available to the [ITA], the accuracy and adequacy of the evidence provided in the petition, determine whether the petition alleges the elements necessary for the imposition of a duty under section 1673 of this title and contains information reasonably available to the petitioner supporting the allegations, and

**(ii)** determine if the petition has been filed by or on behalf of the industry.

**(B) Extension of time**

In any case in which the [ITA] is required to poll or otherwise determine support for the petition by the industry under paragraph (4)(D), the [ITA] may, in exceptional circumstances, apply subparagraph (A) by substituting "a maximum of 40 days" for "20 days".

*   *   *

**(2) Affirmative determinations**

If the determinations under clauses (i) and (ii) of paragraph (1)(A) are affirmative, the [ITA] shall initiate an investigation to determine whether the subject merchandise is being, or is likely to be, sold in the United States at less than its fair value.

**(3) Negative determinations**

If the determination under clause (i) or (ii) of paragraph (1)(A) is negative, the [ITA] shall dismiss the petition, terminate the proceeding, and notify the petitioner in writing of the reasons for the determination.

**(4) Determination of industry support**

**(A) General rule**

For purposes of this subsection, the [ITA] shall determine that the petition has been filed by or on behalf of the industry, if --

**(i)** the domestic producers or workers who support the petition account for at least 25 percent of the total production of the domestic like product, and

**(ii)** the domestic producers or workers who support the petition account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for or opposition to the petition.

**(B) Certain positions disregarded**

**(i) Producers related to foreign producers**

In determining industry support under subparagraph (A), the [ITA] shall disregard the position of domestic producers who oppose the petition[] if such producers are related to foreign producers, as defined in section 1677(4)(B)(ii) of this title, unless such domestic producers demonstrate that their interests as domestic producers would be adversely affected by the imposition of an antidumping duty order.

**(ii) Producers who are importers**

The [ITA] may disregard the position of domestic producers of a domestic like product who are importers of the subject merchandise.

**(C) Special rule for regional industries**

If the petition alleges the industry is a regional industry, the [ITA] shall determine whether the petition has been filed by or on behalf of the industry by applying subparagraph (A) on the basis of production in the region.

### (D) Polling the industry

If the petition does not establish support of domestic producers or workers accounting for more than 50 percent of the total production of the domestic like product, the [ITA] shall --

**(i)** poll the industry or rely on other information in order to determine if there is support for the petition as required by subparagraph (A), or

**(ii)** if there is a large number of producers in the industry, the [ITA] may determine industry support for the petition by using any statistically valid sampling method to poll the industry.

### (E) Comments by interested parties

Before the [ITA] makes a determination with respect to initiating an investigation, any person who would qualify as an interested party under section 1677(9) of this title if an investigation were initiated, may submit comments or information on the issue of industry support. After the [ITA] makes a determination with respect to initiating an investigation, the determination regarding industry support shall not be reconsidered.

### (5) Definition of domestic producers or workers

For purposes of this subsection, the term "domestic producers or workers" means those interested parties who are eligible to file a petition under subsection (b)(1) of this section.

19 U.S.C. §1673a. Similar procedure exists for initiating a countervailing-duty investigation.[6]

---

[6] See 19 U.S.C. §1671a. Of the elements of section 1673a set forth *in haec verba* in this opinion, a textual difference in section 1671a is its notification-of-governments subsection, to wit:

(footnote continued)

As indicated above, the ITA, reacting within the strict timeframe adopted by Congress, found the petitioner SDO to be an interested party within the meaning of the statute, and it upheld "for initiation purposes"[7] the claimed existence of a regional industry.  However, the Department of Commerce also reported that, pursuant to the foregoing statutory authority, it invited representatives of the governments of México, Saudi Arabia and Venezuela for consultations with respect to the countervailing-duty petitions[8]; it determined that refined products are

_____

Upon receipt of a petition filed under paragraph (1), the [ITA] shall –

**(i)** notify the government of any exporting country named in the petition by delivering a public version of the petition to an appropriate representative of such country; and

**(ii)** provide the government of any exporting country named in the petition that is a Subsidies Agreement country an opportunity for consultations with respect to the petition.

19 U.S.C. §1671a(b)(4)(A).

[7] 64 Fed.Reg. at 44,481, col. 1.

[8] See id. at 44,480.  If those invitation(s) issued pursuant to 19 U.S.C. §1671a(b)(4)(A)(ii), supra, it should be noted that Saudi Arabia (in contrast to the two other invitees) is not a "Subsidies Agreement country" within the meaning of that section, although it is the putative leader of the world cartel, the Organization of Petroleum Exporting Countries ("OPEC"), the *ráison d'être* of which is to control production and fix prices of crude oil.  México, while not a formal member of OPEC, apparently attempts to follow its lead.  See, e.g., Ibrahim, Oil Countries Approve World Cutback of 3%, N.Y. Times, March 24, 1999, p. C1; Preston, Mexico Playing Unfamiliar Role in World Oil Politics, N.Y. Times, March 24, 1998, p. D2.  Venezuela is a member of OPEC, as are Iraq and several other countries considered either unfriendly to or genuine enemies of the United States.

(footnote continued)

not within the domestic like product for purposes of determining industry support for the petition[9]; it exercised its statutory discretion to extend the deadline for determining whether to

---

Be the lack of direct diplomatic relations with Iraq (and other hostile, oil-producing lands) as it is, nothing in the language of 19 U.S.C. §§ 1671a(b)(4)(A)(i) and 1673a(b)(3), supra, exempts the ITA from at least attempting to notify Baghdad of SDO's petition, via the embassy of Poland, which ostensibly represented U.S. interests there [see, e.g., U.S. Dep't of State, Iraq - Travel Warning (Sept. 10, 1999)], or otherwise. Cf. 19 C.F.R. §351.202(i) (1999) (ITA "will invite the government of any exporting country named in the petition for consultations"). Indeed, notwithstanding Resolution 661, which was adopted by the Security Council of the United Nations on August 6, 1990 "to bring the invasion and occupation of Kuwait by Iraq to an end and to restore the sovereignty, independence and territorial integrity of Kuwait" and which, among other things, decreed that member states prevent the import of all commodities and products originating in Iraq, and also Executive Order No. 12,-724 of the U.S. President sub nom. Blocking Iraqi Government Property and Prohibiting Transactions With Iraq, 55 Fed.Reg. 33,089 (Aug. 13, 1990), a report of the U.S. government itself discloses that 146,722,000 barrels of crude oil were imported from Iraq into this country during the period January - July 1999. See U.S. Energy Info. Admin., Petroleum Supply Monthly, p. 82 (Sept. 1999). By way of comparison, the Table 40 on that page shows imports from México, Saudi Arabia and Venezuela during that period to have been 272.540, 299.957 and 252.837 million barrels, respectively.

Whether the imports from Iraq were under the guise of the so-called "oil-for-food" program viz. Resolution 986 of the U.N. Security Council (April 14, 1995) and subsequent resolutions or not, the court has reviewed SDO's 235-page volume II of its petition, relating to alleged dumping in America of those millions of barrels of Iraqi oil, and also its 100-page volume VI, relating to claimed benefits bestowed upon such shipments by the government of Saddam Hussein. And the court must affirm that those averments, on their face, are not clearly frivolous.

[9] See 64 Fed.Reg. at 44,481. The ITA also concluded that it did not need to decide definitively whether "lease condensates" are included within the domestic like product. See id.

initiate investigations "[b]ecause there was a question as to whether the petitioner met the statutory requirements concerning industry support"[10]; it sought to survey each of the 410 largest producers in the region, which accounted for over 86 percent of regional production, and a 401-company sample of the remaining producers there[11]; it received letters of opposition from a number of companies which accounted for approximately 50 percent of total regional production[12]; and it considered whether or not to disregard them, focusing on the opposing companies' attempt(s) to demonstrate that their interests as domestic producers would be affected adversely by the imposition of an antidumping or countervailing-duty order[13].  As for that focus, the ITA reports specific resort to the API Ad Hoc Free Trade Committee

---

[10] 64 Fed.Reg. at 44,481, col. 3.

[11] See id. at 44,481-82.

[12] See id. at 44,482.  Notwithstanding the Department's mandate per 19 C.F.R. §351.303(b) (1999) that "all documents" in a matter such as this be addressed and submitted to the Secretary of Commerce, the court notes in passing that the chairman and chief executive officer of at least one major oil company expressed "strong opposition" directly to the President of the United States, with copies of that written displeasure apparently also transmitted directly to the Vice President and the Secretaries of State, Treasury, and Energy, as well as Commerce, and to an Assistant to the President, a Deputy Secretary of the Treasury, an Acting Under Secretary of State, and an Assistant Secretary of Commerce.  See R.Doc 196.

[13] 64 Fed.Reg. at 44,482.

because it is composed of the largest U.S. producers in opposition to the petitions and because its treatment is dispositive of the industry support issue.[14]

According to the agency's determination, the Committee argued

that its opposition is not based on foreign interests or imports, but rather . . . on the fact that the Committee members' interests as domestic producers would be adversely affected by the imposition of antidumping or countervailing duties. [It] also argues that the petitioner has not alleged that each U.S. producer about which allegations were made is related to a foreign producer in each of the subject countries. Moreover, the petitioner has provided no basis for assuming that a relationship in one country would cause a producer to oppose a case against another country with potentially competing suppliers.

Even assuming there are relationships, the Committee argues, because the interest of domestic producers opposing the petition would be adversely affected by the imposition of an order, the Department must consider their views. . . . Finally, with respect to imports, the Committee argues that importing is a standard practice in the U.S. oil industry and that the large producers account for only a small portion of total imports. Moreover, . . . domestic producers which oppose the petition are not bound to imports from the subject countries. Therefore, the Committee argues, the Department should not disregard its opposition.

_____

[14] Id., col. 2. Those 16 firms, in alphabetical order, were listed as ARCO, BHP Petroleum, BP Amoco, Burlington Resources, Chevron Corporation, Conoco Inc., Exxon Corporation, Fina, Inc., Kerr-McGee Corporation, Marathon Oil Corporation, Mobil Corporation, Murphy Oil Corporation, Occidental Petroleum Corporation, Phillips Petroleum Company, Shell Oil Company, and Texaco Inc., which list included their crude-oil production figures (in thousands of barrels) for PADDs I-IV for 1997. See R.Doc 205.

Not only has the Ad Hoc Committee, itself, representing these firms, been granted leave to intervene in this case as a party defendant, BP Amoco, Chevron, Exxon, Mobil, Shell and Texaco have all intervened on their own accounts. Moreover, the court notes in passing that since then the Exxon and Mobil corporations have formally merged, as has BP Amoco PLC (itself a recent union of two erstwhile major oil companies) with ARCO, formerly known as Atlantic Richfield Company.

64 Fed.Reg. at 44,482, col. 2.  The ITA accepted these composite arguments in rendering its decision that the petitioner SDO did not have support from more than 50 percent of the production in the region of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the petition.[15]

B

Plaintiff's complaint pleads nine causes of action herein, which in essence allege (1) the ITA did not include in its calculation the production of a substantial number of domestic producers which support the petition; (2) the agency attributed significant production by SDO-member Apache Corporation to ARCO rather than in support of the petition; (3) the ITA made no finding and did not recognize the views of the Paper, Allied-Industrial, Chemical & Energy Workers International Union, AFL-CIO, CLC in support of the petition on behalf of production-related workers employed by a number of domestic oil producing firms; (4) the agency failed to neutralize the opposition of companies, the workers of which were in support of the petition; (5) the ITA relied on the general arguments of the API Ad Hoc Free Trade Committee, which was contrary to the statutory requirement that individual domestic producers in opposition to the petition prove that their particular interests would be

_____

[15] 64 Fed.Reg. at 44,482.  The agency eschewed addressing "a number of complex issues regarding the 25-percent test . . . because the 50-percent test has not been met."  Id., col. 3.

adversely affected by the imposition of antidumping or counter-
vailing duties; (6) the agency should have disregarded the op-
position of those domestic producers which import crude petro-
leum oil from one or more of the countries singled out in the
petition; (7) the ITA did not allow associations to express
support for SDO members unless those associations qualified
themselves as interested parties; (8) in polling the domestic
industry, the agency failed to include the support of the Inde-
pendent Petroleum Association of America and its membership to
the extent those members had not otherwise communicated their
views; and (9) U.S. Secretary of Energy Richardson stated pub-
licly that the government opposed the petition and that he would
attempt to influence the process established by the Trade Agree-
ments Act, supra.

The plaintiff has now interposed a motion for judgment
upon the agency record pursuant to CIT Rule 56.2, and which is
based upon the foregoing averments, save the claim of undue in-
fluence by the Secretary and/or the Department of Energy.[16]  At
a hearing held in open court on August 14, 2000, which was based

---

[16] In filing its motion for judgment in March 2000, the
plaintiff claimed that,

> [m]ore than six months ago, [it] properly submitted
> a FOIA request to the Department of Energy regarding
> the Secretary's involvement in the Commerce proceed-
> ing.  This request has not been acted on, in contra-
> vention of the FOIA statute.

Plaintiff's Brief, p. 42.  Whereupon it filed a motion for sup-
plemental briefing following a hoped-for response to the afore-
said request.  That motion has been denied.  See Save Domestic
Oil, Inc. v. United States, 24 CIT ___, Slip Op. 00-46 (April
26, 2000).

upon initial review of the ITA record and written submissions on behalf of the parties in appearance, counsel for the defendant were invited to consider consenting to remand to the agency for reconsideration of the complex, competing positions. The defendant declined, and continues to decline, to do so.  See Hearing Transcript ("Tr."), p. 23; Defendant's Response to the Court's Inquiry Concerning Remand, p. 2 ("the Government is not willing to consent to a remand").

## II

Hence, the court is obligated to decide the controversy engendered by the ITA's determination, which, in accordance with the statute, issued within a brief period of time[17].  Jurisdiction is pursuant to 19 U.S.C. §1516a(a)(1)(A) and 28 U.S.C. §§ 1581(c), 2631(c), 2632(c).  The court's standard of review in a case like this is provided by section 2640(b) of Title 28 to be as specified in subsection (b) of section 1516a of Title 19, to wit:

**(1) Remedy**

The court shall hold unlawful any determination, finding, or conclusion found --

---

[17] Indeed, the record reflects understandable concern about its shortness, given the scope and arguable complexity of this case.  See, e.g., R.Doc 39 *passim*; R.Doc 215, pp. 7-8; R.Doc 337, p. 3; Tr., pp. 5-6, 8, 11, 20-21, 41-42, 43.  See also 64 Fed. Reg. at 44,481; Defendant's Response in Opposition to Plaintiff's Motion for Judgment on the Agency Record ["Defendant's Brief"], pp. 7, 26, 71; Brief of Defendant-Intervenor API Ad Hoc Free Trade Comm., pp. 18, 47, 49 and 50, n. 193; Response Brief of Defendant-Intervenor Saudi Arabian Oil Company, p. 39, n. 39; Brief of Petroleos de Venezuela, S.A. and CITGO Petroleum Corp., pp. 10, 11; Brief of Defendant-Intervenor Petróleos Mexicanos et al., pp. 18, 20, 22-23; Brief of Defendant-Intervenor BP Amoco Corp., pp. 7, 9.

**(A)** in an action brought under subparagraph (A) . . . of subsection (a)(1) of this section, to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . ..

**(2) Record for review**

**(A) In general**

For the purposes of this subsection, the record, unless otherwise stipulated by the parties, shall consist of --

**(i)** a copy of all information presented to or obtained by the [ITA] . . . during the course of the administrative proceeding, including all governmental memoranda pertaining to the case and the record of ex parte meetings required to be kept by section 1677f(a)(3) of this title; and

**(ii)** a copy of the determination, all transcripts or records of conferences or hearings, and all notices published in the Federal Register.

**(B) Confidential or privileged material**

The confidential or privileged status accorded to any documents, comments, or information shall be preserved in any action under this section. Notwithstanding the preceding sentence, the court may examine, in camera, the confidential or privileged material, and may disclose such material under such terms and conditions as it may order.  . . .[18]

---

[18] The court is constrained to confirm persistent difficulty in reviewing and thus reporting on the complete contents of the record as compiled by the agency, perhaps due to the scope and the complexity of SDO's eight country-specific petition volumes. The ITA's most-reliable indexing seems to be that for Venezuela, Inv. No. A-307-817, ergo the R.Doc numbers cited in this opinion come from that antidumping investigation file. Moreover, certain information which has now been received pursuant to CIT Rule 71-(b)(3) ["At any time, the court may order any part of the record retained by the agency to be filed"] is confidential and therefore not subject to publication herein.

A

The crux of defendant's determination is that domestic U.S. producers which opposed SDO's petition demonstrated that their interests as such would be adversely affected by any imposition of antidumping and/or countervailing duties, whereupon their production of the domestic like product was counted against the petition. But according to the statute, 19 U.S.C. §§ 1671a-(c)(4)(B)(i), 1673a(c)(4)(B)(i), supra, such adverse counting has been prescribed by Congress only when domestic producers are related to foreign producers, as defined in 19 U.S.C. § 1677(4)(B)(ii), which provides:

**(4) Industry** . . .

**(B) Related parties**

**(i)** If a producer of a domestic like product and an exporter or importer of the subject merchandise are related parties, or if a producer of the domestic like product is also an importer of the subject merchandise, the producer may, in appropriate circumstances, be excluded from the industry.

**(ii)** For purposes of clause (i), a producer and an exporter or importer shall be considered to be related parties, if --

**(I)** the producer directly or indirectly controls the exporter or importer,

**(II)** the exporter or importer directly or indirectly controls the producer,

**(III)** a third party directly or indirectly controls the producer and the exporter or importer, or

**(IV)** the producer and the exporter or importer directly or indirectly control a third party and there is reason to believe that the relationship causes the producer to act differently than a nonrelated producer.

For purposes of this subparagraph, a party shall be considered to directly or indirectly control another party if the party is legally or operationally in a position to exercise restraint or direction over the other party.

Obviously, the dispositive concept of this provision is *control*. While alluding to "serious questions about the sufficiency of the petitioner's allegations"[19] in this regard, the ITA nonetheless reached beyond those questions to decide the clearly contingent issue of whether the allegedly-foreign-related petition opponents "would be adversely affected" by any duties imposed herein. That approach did not follow the law on its face, nor was the approach even the more expedient, given the parties' presentations and the relatively few days in which to resolve the tandem elements of sections 1671a(c)(4)(B)(i) and 1673a(c)(4)(B)(i) governing disregard of opposition by domestic producers related to foreign producers.

On its part, SDO did allege that 15 of the 16 members of the API Ad Hoc Committee are related to Petroleos de Venezuela, S.A., that nine of those member companies are also related to the Mexican PEMEX enterprise(s), and that eight Committee companies are related to Saudi Aramco. See, e.g., R.Docs 14, 198, 207-10, 226-30, 243, 244, 287, 288, 290. None of the 16

_____

[19] 64 Fed.Reg. at 44,482, col. 1.

Committee members, however, was alleged to be related to Iraq's state-owned oil business, but SDO did assert that ten of them do import Iraqi crude, with nine companies alleged to import from México, ten from Saudi Arabia, and also ten from Venezuela. See, e.g., id.

With regard to Venezuela, the record does reflect business relationships between Committee companies and enterprises of that country[20], but it does not substantiate that those referred to by SDO entail the kind of control contemplated by section 1677(4)(B)(ii), supra, nor did the ITA even attempt to draw any conclusion to the contrary. The same is true with respect to México[21] and Saudi Arabia[22]. Unlike CITGO, Texaco

---

[20] In fact, although not disclosed by the CIT Forms 13 regarding corporate affiliations and financial interest filed in conjunction with the motion of Petroleos de Venezuela, S.A. and CITGO Petroleum Corporation for leave to intervene as parties defendant herein, the latter firm is wholly-owned by the former. Neither is an Ad Hoc Committee member, however.

The types of relationships alleged by SDO to exist between Committee companies and Venezuelan enterprises are debt-financing, designated-customer, joint-venture. See, e.g., R.Docs 14, 198, 207, 208, 210, 227-30, 243, 244, 287, 288, 290.

[21] See, e.g., R.Docs 14, 207, 209, 210, 226, 227, 229, 230, 244, 287, 290.

[22] Indeed, volumes IV and VIII of SDO's petition regarding this nation undermine any claim of control of or by Committee companies, and thus of any relationship within the purview of the statute quoted in the text. That is, each volume states at the outset:

>     Oil exploration and production in Saudi Arabia
>     began in the 1930s, when the Kingdom granted a con-
>     cession to the Standard Oil Company of California

(footnote continued)

Inc., for example, is not a subsidiary in the United States of Petróleos de Venezuela, S.A., nor is Petróleos Mexicanos a vassal in its home country of Kerr-McGee Corporation. In short, the failure to find controlling relationships between any of the four national exporters implicated by SDO's petition and any of the Committee companies made the agency resort to the secondary standard of 19 U.S.C. §§ 1671a(c)(4)(B)(i), 1673a(c)(4)(B)(i) inapposite and not in accord with the intent of Congress in enacting it in URAA.

B

In general, the ITA has, and has had, discretion in interpreting and administering the Trade Agreements Act of 1979. And this Court of International Trade and its Court of Appeals for the Federal Circuit have afforded Commerce continuing deference in carrying out its difficult statutory responsibilities.

---

(now Chevron). By the late 1940s, a joint venture of U.S. firms, including Exxon, Texaco, Chevron, and Mobil, created the Arabian American Oil Company, or Aramco.

Saudi Arabia nationalized Aramco in 1976, giving the Saudi government full ownership of all hydrocarbon reserves and oil facilities in its territory. At first, Aramco remained an incorporated U.S. company and was operated on a fee basis by its four previous owners. However, in 1988 Aramco became the Saudi Arabian Oil Company (Saudi Aramco), a Saudi-registered, state-owned corporation, by Royal decree.

R.Doc 1, vol. IV, pp. 4-5; vol. VIII, p. 1 (footnotes omitted). Each describes the current standing of the government company under the Saudi Basic Law and its corporate statute. The description does not leave room for the concept of continuing western control, nor is there ground for accepting herein a claim of Saudi control over Exxon/Mobil, Texaco, Chevron, or other multinational producers of crude oil.

See, e.g., Nippon Steel Corp. v. United States, 219 F.3d 1348 (Fed.Cir. 2000); Mitsubishi Heavy Indus., Ltd. v. United States, 24 CIT ___, Slip Op. 00-97 (Aug. 8, 2000). Indeed, various sections of the Trade Agreements Act, as amended, directly reflect the intent of the legislature in this regard.

(1)

Sections 1671a(c)(4)(B)(ii), 1673a(c)(4)(B)(ii), supra, which are at issue herein, state that the ITA "may" disregard the position of domestic producers of a domestic like product who are importers of the subject merchandise. In this matter, the agency apparently determined to rely on its inapposite analysis under preceding subsections (c)(4)(B)(i) that the API Ad Hoc Committee companies, *en masse*, would be adversely affected by the imposition of any antidumping or countervailing-duty order and thus to not disregard their opposition to SDO's petition. But the application of subsections (c)(4)(B)(ii) is distinct from that of those preceding subsections and contingent upon the existing facts and circumstances precisely relevant thereto.

Here, the following 1997 domestic production figures (in thousands of barrels of crude oil) for the region represented by SDO were disclosed to the ITA by the Ad Hoc Committee counsel for the 16 members:

| | |
|---|---:|
| ARCO | 63,592 |
| BHP Petroleum | 1,570 |
| BP Amoco | 81,395 |

| | |
|---|---|
| Burlington Resources | 24,600 |
| Chevron Corporation | 71,905 |
| Conoco Inc. | 21,320 |
| Exxon Corporation | 53,290 |
| Fina, Inc. | 3,806 |
| Kerr McGee Corporation | 8,760 |
| Marathon Oil Corporation | 38,350 |
| Mobil Corporation | 44,895 |
| Murphy Oil Corporation | 3,650 |
| Occidental Petroleum Corporation | 18,980 |
| Phillips Petroleum Company | 20,075 |
| Shell Oil Company | 100,010 |
| Texaco Inc. | 79,244 |

R.Doc 205. Obviously, the variance is almost one to one hundred (even without any accounting for the results of subsequent government acquiescence in the merger of Exxon and Mobil and now ARCO with BP Amoco). As for imports from the four national exporters singled out herein, SDO claims Committee companies imported millions of barrels (in 1998) as follows:

| | |
|---|---|
| ARCO | 2,329,065 |
| BP Amoco | 69,744,565 |
| Chevron Corporation | 101,805,000 |
| Conoco Inc. | 55,530,735 |
| Exxon Corporation | 137,154,955 |
| Fina, Inc. | 38,652,040 |

| | |
|---|---|
| Marathon Oil Corporation | 88,400,000 |
| Mobil Corporation | 120,487,595 |
| Murphy Oil Corporation | 33,852,655 |
| Occidental Petroleum Corporation | 63,480,435 |
| Phillips Petroleum Company | 37,707,785 |
| Shell Oil Company | 133,330,485 |
| Texaco Inc. | 198,559,635 |

Whatever the precise figures for a particular firm and calendar year[23], the magnitude of U.S. crude oil imports from around the world, including Iraq, México, Saudi Arabia and Venezuela, is notorious.  In fact, the imports from just those four countries exceeded, if not dwarfed, the above-listed domestic, regional numbers for every individual Committee company save ARCO/BP Amoco.[24]

This phenomenon indicates, of course, and the record supports, that the Committee companies have an interest in this case, but it by no means presages the ITA's determination not to disregard their opposition to SDO's petition. To begin with, the

---

[23] See R.Docs 198, p. 13; 207, p. 21; 208, p. 11; 210, p. 16; 226, p. 21; 227, p. 9; 229, p. 22; 230, p. 14; 243, p. 14; 244, p. 14; 287, p. 13; 290, p. 15; Plaintiff's Brief, pp. 11, 34.  Import figures for these firms for 1997 can be derived from publicly-available data of the Energy Information Administration of the U.S. Department of Energy and are, in most cases, similar to the 1998 numbers.

[24] The record does not reflect imports from the countries in question on the part of BHP Petroleum, Burlington Resources, or Kerr-McGee Corporation.

domestic, regional industry which SDO attempts to represent con-
sists of more than 11,000 "independent", smaller-scale enter-
prises, a majority of whose oil wells and related workers have
been at a standstill[25].  Their business, to the extent still via-
ble, is hardly in the same league with the truly global pursuit
and production of petroleum and its multiple, finished deriva-
tives by the "integrated", multinational members of the API Ad
Hoc Committee.  To be sure, such economic disparity, however ex-
traordinary, should not be automatically dispositive under the
law governing a case like this, in particular where scale and
complexity increase, which is the situation of Committee compa-
nies.  While Fina, Inc.'s domestic production, for example, is
but a fraction of the quantum of its imports, and ARCO's U.S.
production exceeds its imports from all four target nations by
some 60 million barrels, and the imports of Conoco, Murphy,
Occidental and Phillips combined therefrom do not equal those
of Texaco alone[26], the ITA not only acquiesced in the lumping of
all those apparently-disparate competitors together, it adopted
their Committee's above-quoted, composite arguments as to how
"members' interests as domestic producers would be adversely
affected by the imposition of antidumping or countervailing
duties."  64 Fed.Reg. at 44,482, col. 2.  This lump-sum state-
ment was embraced without any reported agency analysis of per-

---

[25] Compare R.Doc 215, p. 7 with Tr. at 44-45.

[26] See R.Docs 205, 226.  But see Brief of Defendant-In-
tervenor Texaco Inc., pp. 18-19.

ceptible elements of any adverse effect due, for example, to po-
litical displeasure, real or feigned, on the part of the govern-
ment of Iraq, México, Saudi Arabia or Venezuela; to duties of
say 5 percent as opposed to fifty; to attempted redirection of
exports by one or more of those governments; to decreased de-
mand in the United States induced by the prospect of yet another
American impost.  Cf. R.Doc 334 passim.  Moreover, within the
realm of conflict of interest engendered by significant imports
on the part of firms also producing in PADDs I-IV but opposing
SDO, there was no ITA attempted differentiation between the
levels and resultant percentages of those imports, the capaci-
ties of Committee companies to draw upon sources available else-
where on Earth or in this country[27], or the degrees of competi-
tion among various members.  Ibid.  In fact, not all of those
companies actually subscribed to the composite Committee claim
that domestic prices would fall if any antidumping or counter-
vailing duty really were to be imposed.  Compare id. at 4 with

---

[27] To quote, for example, from the Brief of Petroleos de
Venezuela, S.A. and CITGO Petroleum Corporation, pages 15-16,
in this regard:

> . . . [T]he major U.S. oil companies were not wedded to
> the "allegedly dumped imports."  They simply had too
> many alternatives.  As the experts explained, crude oil
> is a worldwide . . . commodity that is produced around
> the world and sold at prices dictated by the world mar-
> kets.  As the report of the Petroleum Industry Research
> Foundation indicated, "replacement supplies appear to
> be readily available."  Thus, the major U.S. oil com-
> panies did not need to import crude oil from the four
> countries named in the petitions; they could obtain the
> oil from a variety of other sources at the same prices.

R.Doc 82, p. 3 and R.Doc 293, third page.  Yet, the agency took
no final account of any difference of opinion.

When SDO then brought its complaint to this court, as
noted above, the API Ad Hoc Free Trade Committee duly moved for
leave to intervene as a party defendant, as did member companies
BP Amoco, Chevron, Exxon, Mobil, Shell and Texaco, each on its
own account.  The Committee's motion was granted, but the court,
upon reading the ITA's published determination to dismiss sum-
marily SDO's petition, had no basis for determining how interven-
tion of those members would not be redundant, whereupon their
individual motions for leave to intervene were denied.  See Save
Domestic Oil, Inc. v. United States, 23 CIT ___, Slip Op. 99-108
(Oct.  12, 1999).  Each motion was renewed, gainsaying that the
Ad Hoc Committee represented the members on anything more than
"common interests", e.g.:

> . . . Exxon [] relied on the Committee to represent
> their common interests through the Committee's par-
> ticipation in the proceedings before the . . . ITC
> [] and the Department of Commerce . . ..
>
> But while the Committee represented its mem-
> bers' common interests, it did not represent its
> members on those issues as to which a member's par-
> ticular facts or circumstances were involved.  In
> this regard, Exxon itself participated actively in
> the administrative proceeding below, and opposed
> the initiation of an investigation.  Toward that
> end, it submitted Exxon-specific questionnaire re-
> sponses to both the ITC and the Commerce Department,
> responded to allegations that pertained solely to
> Exxon . . . and provided additional Exxon-specific
> data where it was called for . . ..

Amended Consent Motion of Exxon Corporation to Intervene, pp. 2-3 (emphasis in original).  The renewed motions to intervene were thereupon granted, confirming the Committee's inability to represent its members' individual interests.

(2)

As set forth above, the provision in the Trade Agreements Act for disregard of the position of domestic producers of a domestic like product which are importers of the subject merchandise was expanded by the Uruguay Round Agreements Act.  And the record indicates that this case is the first in which the ITA declined to disregard importer opposition.  Cf. Defendant's Brief, pp. 60-67; Tr., pp. 10-11. The Statement of Administrative Action, which issued in conjunction with the URAA enhancement and carries "particular authority"[28], explains:

> Amended sections 702(c)(4)(B)(ii) and 732(c)-(4)(B)(ii) also provide that, as under current practice, Commerce will not apply a bright line test to determine whether a producer who is an importer of the subject merchandise or who is related to an importer of the subject merchandise should be excluded from the domestic industry.  Instead, it will look to relevant factors, such as percentage of ownership or volume of imports.  For example, the exclusion of a company that imports a small amount of subject merchandise, by comparison with its total production, will depend on whether that company and petitioners have a common stake in the investigation. See Citrosuco Paulista, S.A. v. United States, 704 F.Supp. 1075, 1085 (Ct. Int'l Trade 1988).

---

[28] H.R. Doc. No. 103-316, vol. I, p. 656 (1994).

H.R. Doc. No. 103-316, vol. I, pp. 858-59 (1994). In the case
cited with approval, which arose well before adoption of URAA
and involved imports of frozen concentrated orange juice from
Brazil, the court affirmed the ITA's reliance on 19 U.S.C. §
1677(4)(B), supra, to exclude producers from the "domestic in-
dustry" that derived a majority of their product from the im-
ports under investigation, that is, in excess of 50 percent. In
other words, the agency had taken the position

> that firms with large imports of the allegedly dumped
> or subsidized merchandise may be excluded from the
> definition of the domestic industry, because they in-
> herently lack the stake in the final investigation
> being pursued by the petitioner.

12 CIT at 1206, 704 F.Supp. at 1085.

The parties agree herein that, since enactment of URAA,
three other proceedings encumbered the ITA with the issue at bar,
two earlier and one subsequent to the determination to dismiss
SDO's petition.  See Ball Bearings and Parts Thereof From Thai-
land; Final Results of Changed Circumstances Countervailing Duty
Review and Revocation of Countervailing Duty Order , 61 Fed.Reg.
20,799, 20,801 (May 8, 1996) ("Objecting Parties cannot be said
to have a common 'stake' with the petitioner"); Initiation of
Antidumping Duty Investigations: Live Cattle from Canada and
Mexico, 63 Fed.Reg. 71,886 (Dec. 30, 1998) (opposition to pe-
tition by importer from México of some 10-15 percent of its
stock requirements disregarded); Initiation of Antidumping In-
vestigation: Citric Acid and Sodium Citrate From the People's

Republic of China, 65 Fed.Reg. 1,588, 1,589 (Jan. 11, 2000)("The

Department has disregarded Proctor & Gamble, Inc.'s opposition

because . . . they are a major purchaser and user of domestic

and imported citric acid and sodium citrate").

This is the first case to have the issue considered

anew in court.  On its part, the plaintiff takes the position

that those three matters reflect "consistent prior practice" and

"established precedents"[29], amounting to "traditional practice"[30],

and that the ITA had a duty to explain its departure from such

prior norm.  Plaintiff's Reply Brief, p. 11, citing Atchison,

Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade, 412 U.S. 800,

808 (1973).  The defendant properly recognizes its duty in this

regard but also that it "is not obligated to adhere to the same

policies over time."  Defendant's Brief, p. 62.  Accordingly,

the ITA did not follow Citrosuco "because the peculiarities of

the oil industry did not warrant application of the same test."

Id. at 63.  That is, the agency

> found that the facts present in the oil industry
> required the agency to consider factors other than
> the level of imports.  Specifically, Commerce noted
> that "oil is a limited, non-renewable natural re-
> source" and that "current U.S. demand cannot be sat-
> isfied solely by increasing domestic production; it
> can be satisfied only through a substantial level of
> imports."  "[W]hen fairly and sympathetically read
> in the context of the entire opinion of the agency"
> (Atchison, 412 U.S. at 809), these distinctions re-
> veal that Commerce exercised its discretion in the

---

[29] Plaintiff's Reply Brief, p. 11.

[30] Id. at 15.

Dismissal Determination in a manner consistent with
congressional intent.

Id. at 63-64 (footnote omitted).

While the world of petroleum may well be *sui generis*,
this alone does not necessarily confirm that the ITA's approach
was consistent with congressional intent.  For example, the
government's own public data demonstrate that proved domestic
reserves were almost four times even last year's gross U.S.
consumption.[31]  Moreover, domestic production in PADDs I-IV
during 1999 nearly equalled the 1,545,866,000 barrels of crude
oil imported from Iraq, México, Saudi Arabia and Venezuela and,
in fact, exceeded the 1,412,161,000 barrels imported from all
other countries.  Included in that group is the largest single
exporter to the United States, Canada, not an OPEC member.
Nevertheless, the government quotes with approval the proposi-
tion of the Petroleum Industry Research Foundation, Inc.
("PIRINC") that affirmative relief for SDO in this case "would
'undermine the unity and effectiveness of OPEC, and non-OPEC
producers by adding incremental supply to the market' which
would, in turn, lead to lower prices."  Defendant's Brief, p.
53, quoting R.Doc 269, Exhibit E, p. 3.

---

[31] See U.S. Energy Info. Admin., U.S. Crude Oil, Natural
Gas, and Gas Liquids Reserves - 1998 Annual Report, pp. 19-26
(1998). Cf. M.A. Adelman, The Genie out of the Bottle, p. xxii
(1995)("World oil shortage is a fiction, but belief in this fic-
tion is a fact"); Thomas Gold, The Deep Hot Biosphere (1999).

Whatever the geological and concomitant political re-
alities, Congress and Commerce both have referred to a "common
stake" in the economics underlying a given administrative pro-
ceeding as the dispositive test.  And whether an importer passes
that test in order to have its opposition to a petition for im-
position of antidumping or countervailing duties counted neces-
sarily entails ITA consideration of that firm's level of imports
and resultant dependency thereon.  For the agency not to have
administered its test on an individual basis was an abuse of its
discretion.  As counsel for the API Ad Hoc Committee, itself, ar-
gued to the ITA, "expressions of support by oil industry associa-
tions are non-probative in these cases".  R.Doc 321, p. 5.

C

That argument was directed at associations which sought
to support SDO's petition, one of which was the Independent Pe-
troleum Association of America ("IPAA").  It asserted that a "ma-
jority of its members engage in the exploration and production
of the domestic like product"[32] and therefore that it qualified
as an "interested party" under the statute.  Responding to an
ITA questionnaire, IPAA claimed such status on the ground that
a majority of its members have offices in PADDs I-IV but that
it was unable to provide production figures for them within that
region.  See R.Doc 148, QR p. 2.  Whereupon, the ITA declined to
grant IPAA standing.  See R.Doc 336, pp. 3-4.

---

[32] R.Doc 336, p. 1.

The Trade Agreements Act definition of an "interested party" is, in pertinent part, as follows:

> **(C)** a manufacturer, producer, or wholesaler in the United States of a domestic like product,
>
> **(D)** a certified union or recognized union or group of workers which is representative of an industry engaged in the manufacture, production, or wholesale in the United States of a domestic like product,
>
> **(E)** a trade or business association a majority of whose members manufacture, produce, or wholesale a domestic like product in the United States,
>
> **(F)** an association, a majority of whose members is composed of interested parties described in subparagraph (C), (D), (E) with respect to a domestic like product . . ..

19 U.S.C. §1677(9). In tying such status to a domestic like product, clearly Congress intended to provide in a case such as this for associations like IPAA. See, e.g., S.Rep. No. 96-249, p. 90 (1979). And the ITA did not proceed otherwise[33], witness its seemingly-spontaneous embrace[34] of the API Ad Hoc Committee. Rather, the agency properly required IPAA to prove the necessary connection to the regional domestic like product. While IPAA initially was unable to obtain the requisite information, it may still be able to establish on remand that its members are regional producers.

---

[33] See id. at 2-3.

[34] Cf. Letter from Robert J. Heilferty, Esq. to the Court (Aug. 31, 2000).

(1)

In enacting URAA, Congress also clearly indicated its intent that "labor have equal voice with management in supporting or opposing the initiation of an investigation." H.R. Rep. No. 103-826, pt. 1, p. 48 (1994).

> If workers are represented by a union, Commerce will count the production of those firms whose workers are represented by the union as being for or against the petition in accordance with the workers' position. If the management of a firm expresses a position in direct opposition to the views of the workers in that firm, Commerce will treat the production of that firm as representing neither support for nor opposition to the petition.

Id. A regulation of the Department, 19 C.F.R. § 351.203(e)(5) (1999), provides that, in conducting a poll of an industry, the ITA "will include unions, groups of workers, and trade or business associations."

Here, the record reflects an attempt by the agency, pursuant to 19 U.S.C. §§ 1671a(c)(4)(D), 1673a(c)(4)(D), supra, to poll each of the 410 largest producers in PADDs I-IV, which account for over 86 percent of the production therein, and 401 of the remaining producers in the region. See 64 Fed.Reg. at 44,481-82. The ITA reports receipt of responses from 41 percent of the "companies" comprising the first group and from 18 percent of the sampled 401 "companies". Id. at 44,482, col. 1. There is no indication that the agency, contrary to its own regulation and

the intent of the governing statute, made any attempt to poll
production workers at those particular firms, nor did it other-
wise determine where labor stands *vis-à-vis* SDO's petition. <u>See</u>
R.Doc 215, pp. 8-9; R.Doc 331, p. 2.

        The U.S. Department of Labor reports that the petroleum
industry experienced a sharp decline in domestic exploration and
production and an extended period of downsizing and restructur-
ing, losing almost 390,000 jobs from 1982 to 1995, as contrasted
with some 339,000 still existent wage and salary jobs in 1998.
U.S. Dep't of Labor Bulletin 2523, <u>Career Guide to Industries
2000-01 Edition</u>, p. 34 (Jan. 2000).  Moreover, that Department
projects an additional, overall 17 percent decline through the
year 2008.  <u>Cf</u>. <u>id</u>. at 35.  As for the positions found still
active, the Bureau of Labor Statistics reports about 60 percent
in 1999 were in just four states, three of which, Louisiana,
Oklahoma and Texas, are within the ITA's designated region [<u>id</u>.
at 34]; more than seven out of ten establishments employ fewer
than ten workers, although more than half of all workers in the
industry are employed in settings of 50 or more [<u>id</u>.]; and

> [f]ew industry workers belong to unions.  In fact,
> only about 4 percent of workers were union members
> or covered by union contracts in 1998 . . ..

<u>Id</u>. at 36.

        Be that last statistic as it is, the Paper, Allied-
Industrial, Chemical & Energy Workers International Union, AFL-

CIO, CLC ("PACE") came forward with an expression of support for SDO, whereupon it was served with an ITA questionnaire "to ascertain whether the union qualifies as an interested party and, if so, how to account for its support."  R.Doc 337, p. 1.  PACE claimed support emanating from members in the employ of ten companies.  The ITA disregarded the pipeline workers at four of those firms because they "are involved solely in transporting crude oil" and thus are not "engaged in the production of crude oil (i.e., operating the wells)."  Id. at 3.  That nuance apparently does not exist with respect to the other six companies, but the agency also took no account of their production workers' indicated support of SDO on the ground that their chosen union representative failed to provide requested information, viz.:

> . . . [W]ithout production data for the specific facilities at which PACE represents workers engaged in the production of crude oil, we have no way of accounting for its support.

Id.

The plaintiff complains that the ITA should have accounted for the workers' support at all ten firms.  It argues that the managements of those companies are possessed of the production data requested by the agency and that their workers "should not have been penalized simply because the data w[ere] wholly in management[] hands."  Plaintiff's Reply Brief, pp. 19-20.  It claims that, since the agency decided to conduct a poll of the industry, it was arbitrary and capricious to have done so without

eliciting information about worker support for the
petition or . . . determining the production of
crude oil by those companies whose workers support-
ed the petition.

Id. at 20.  And the plaintiff also argues that pipeline workers

are an integral part of the production of petroleum and that the

production of the four firms where PACE members work should

therefore have been taken into account by the ITA.

Indeed, it is hard to imagine meaningful "production"

of the liquid raw material that is crude petroleum oil without

its passage through pipe, often arrayed in lines for miles,

whether near or in the Persian Gulf, the Gulf of México, or any-

where else, yet the court notes that the workers who man those

pipelines are not necessarily classified by the government with

their brethren who engage in "oil and gas extraction". Compare,

e.g., Executive Office of the President, Office of Mgmt. & Budg-

et, North American Industry Classification System - United States

1997, pp. 67-68 (1998) with id. at 478-79.  This is not to state

that, had the ITA counted PACE's members at the four domestic

companies involved in transporting crude oil as properly aligned

in support of SDO's petition, such approach would have violated

the Trade Agreements Act, as amended, supra.  On the other hand,

given that statute and the clear intent of Congress in enacting

URAA, this court concludes that it was not in accordance with

law for the agency to have failed to account at all for the views

of labor in this case.

(2)

        Under the statute as set forth above, standing is tied

to a domestic like product, which Congress has defined to mean

        a product which is like, or in the absence of like,
        most similar in characteristics and uses with, the
        article subject to an investigation[,]

19 U.S.C. §1677(10), and which the ITA determined to define here-

in as "crude petroleum oils and oils obtained from bituminous

minerals testing at, above, or below 25 degrees A.P.I."  64

Fed.Reg. at 44,480, col. 3.  In doing so, the agency confirmed

that the class or kind of merchandise to be investigated "norm-

ally will be . . . as defined in the petition"[35] and also con-

firmed that it followed that practice herein, thereby rejecting

attempts by interested parties to have refined products and

"lease condensates" also considered the domestic like product.

Id. at 44,481, cols. 2-3.  The inclusion of either could have

an impact on this case, given the support for, and nature of

the opposition to, SDO's petition.

        With regard to refined products, there is little on

the record to support the proponents of inclusion.  Indeed, the

plaintiff argues that refining needs and expectations, much of

them offshore, are what genuinely motivate the Ad Hoc Committee

---

        [35] 64 Fed.Reg. at 44,481, col. 2.

companies in opposition to its petition, not their domestic pro-
duction of the raw material SDO's members capture.[36]

     Be that part of the ITA's determination as it is, Com-
mittee companies also urged the inclusion of "lease condensates",
which position engendered the following reported discussion:


     The issue of whether "lease condensates" are
     included properly within the domestic like product
     is more complicated.  Lease condensates consist es-
     sentially of a mixture of certain hydrocarbon com-
     pounds that, in terms of weight and complexity, fall
     between natural gas and crude oil.  They are liquids
     formed from natural gas as a result of temperature or
     pressure changes.  Often lease condensates are mixed
     with crude oil and the resulting mixture is sold to a
     refinery as crude oil.


     The petitioner argues that the Department should
     not include lease condensates in the domestic like
     product because the mixture of hydrocarbon compounds
     in lease condensates is different from the mixture of
     hydrocarbon compounds in crude oils.  Consequently, it
     asserts, lease condensates can only be refined into a
     limited range of products.  Opposing the petitioner's
     position, other parties have argued that lease conden-
     sates are very similar in physical characteristics and

---

[36] Compare Plaintiff's Brief, pp. 28-30 with R.Doc 82, p. 9
("If Chevron's access to foreign crude at competitively set mar-
ket prices is restricted, the cost of operating our U.S. refiner-
ies that cannot run domestic crudes efficiently will increase")
and R.Doc 180, p. 5 ("Shell is vitally concerned with events --
such as the extraordinary import duties sought by the petition-
er[] in these proceedings -- that threaten . . . to deprive
Shell's refining operations of access to essential crude oil sup-
plies") and Confidential Record Document ("ConfDoc") 49, p. 2
("the imposition of additional tariffs or countervailing duties
would have the potential of negatively impacting domestic refin-
ers. Phillips . . .") and ConfDoc 79, p. 61 ("These duties would
increase Mobil's supply and production costs for gasoline, avia-
tion fuel, lubricants and other petroleum products and petro-
chemicals in the United States").

uses to light crude oil and that, when mixed, they
simply become an indistinguishable part of the crude-
oil stream which is sent to the refinery.

In addition to the extremely complex technical
nature of the issue, ascertaining the precise nature
of available production and distribution data as well
as attempting to establish the appropriate analytical
framework for a very diverse industry has been proble-
matic for the Department. However, it is not necessary
to decide this issue because . . . we have determined
that the petitioner does not have the requisite indus-
try support, regardless of how the issue of lease con-
densates is resolved.

Id. Given that this case must be remanded for reconsideration

by the agency, decision of this issue may become necessary. For

example, if, as SDO contends, lease condensates are not found

in its members' domestic product, but prove to be part of the

product obtained domestically by Committee companies, then that

part may have to be discounted in the opposition of those pro-

ducers to the petition.

III

Perhaps, the "extremely complex technical nature" of

the lease-condensates issue was exacerbated by the limited time

afforded the ITA by the statute.  But expeditious, generally-

affirmative initial action, has been the mandate of Congress

since 1979.  That is, the intent of the Trade Agreements Act

has been that the agency

act upon all petitions which, based upon facts reason-
ably available to petitioner, make reasonable allega-
tions of the presence of the elements necessary for
the imposition of a . . . duty . . .. Consequently,
the Committee expects that the [ITA] will act upon
most petitions, rejecting only those which are clear-

> ly frivolous, not reasonably supported by the facts
> alleged or which omit important facts which are rea-
> sonably available to the petitioner.

H.R. Rep. No. 96-317, p. 51 (1979). And this expectation of Congress has been realized almost one thousand one hundred times since then, with only one petition having been summarily rejected over the past 20 years on reasoning remotely similar to that herein, and notwithstanding subsequent judicial appreciation of the ITA's limited time for rendering a determination. E.g., Fujitsu Ltd. v. United States, 23 CIT ___, ___, 36 F.Supp.2d 394, 401 (1999), and cases cited therein.

Of course, the fact that at least preliminary ITA (and ITC) investigation ensues in the "vast majority of cases", to quote from the reported URAA contemplation of Congress regarding initial agency time to consider petitions upon filing, H.R. Rep. No. 103-826, pt. 1, p. 49 (1994), does not necessarily lead to any affirmative final antidumping or countervailing-duty relief. And this court is neither at liberty nor able to project the outcome(s) of any agency investigation(s) in this case, which may genuinely entail phenomena beyond the hale of the 1979 Act. Suffice it to state at this stage, however, that the ITA's dismissal of SDO's petition, as described and discussed above, was not in accordance with law. Ergo, plaintiff's motion for judgment upon the agency record developed to date must be, and it hereby is, granted.

This case is hereby remanded to Commerce for contemplation of commencement of a preliminary investigation by its ITA (and referral for such an investigation by the ITC) in accordance with law, as set forth hereinabove.  The defendant may have 60 days from the date hereof for this purpose.  To the extent, in the exercise of its sound discretion during that time, the agency determines to reconsider its analysis of any of the threshold issues raised by the petition, including the nature of SDO's domestic product *vis-à-vis* that of other domestic producers and support for, and opposition to, the petition on the part of domestic producers and workers, the ITA may call upon the interested parties to supplement the record, and also upon the U.S Departments of Labor and of Energy for relevant, publicly-available data not yet part of the record.  If the stated opposition of the API Ad Hoc Free Trade Committee is still sought to be taken into account, the agency is hereby directed to consider the facts and circumstances of the business of each Committee company, standing on its own, including most necessarily that particular company's imports of crude petroleum oil from Iraq, México, Saudi Arabia or Venezuela.

If the result of this remand is not initiation of preliminary investigation(s) by the ITA (and the ITC), the written reasons therefor are to be filed with the court on or before the close of the aforesaid 60-day period, whereupon the parties here-

to may have 30 days to serve and file comments thereon, with any replies thereto due within 15 days thereafter.

       So ordered.

Decided:  New York, New York
          September 19, 2000


                                  _____
                                          Judge